1
2
3
4
5
6                    **UNITED STATES DISTRICT COURT**
7                        **DISTRICT OF NEVADA**
8
9    KRISTY HENDERSON,                    )
                                          )
              Plaintiff,                  )
10                                        )          2:13-cv-01921-RCJ-VCF
         vs.                              )
11                                        )
     JOHN BONAVENTURA et al.,             )              **ORDER**
12                                        )
              Defendants.                 )
13   _____ )

14          This case arises out of the termination of a Deputy Constable of the Las Vegas Township

15   Constable's Office ("LVTCO").  Pending before the Court is Defendants' Motion to Dismiss or

16   for Summary Judgment (ECF No. 67).  For the reasons given herein, the Court grants the motion

17   as a motion for summary judgment.

18   **I.      FACTS AND PROCEDURAL HISTORY**

19          Plaintiff Kristy Henderson was a Deputy Constable with LVTCO for several years,

20   having been appointed by Defendant Constable John Bonaventura's predecessor. (Compl. ¶ 8,

21   Oct. 21, 2013, ECF No. 1).  After Bonaventura was elected, Defendant Deputy Constable Lou

22   Toomin directed Plaintiff to appear in a pilot episode of a reality television program about

23   LVTCO, which she did. (*Id.* ¶ 9).  Bonaventura soon began making sexual comments to

24   Henderson on a regular basis, asking her to sit on his face and wear a miniskirt and garters to

25   work, telling her that her "hard body" made part of his body hard, and other vulgar and sexually

1   harassing comments. (*Id.* ¶ 10).

2      In January 2012, members of the Clark County Board of Commissioners expressed their

3   concern over the proposed reality show because it depicted several deputies using profanity and

4   abusive language with members of the public, as well as other unprofessional and embarrassing

5   behavior. (*Id.* ¶ 12).  The Board held a hearing on January 3, 2012 at which they expressed

6   displeasure with the idea of the show, and Deputy John Watkins, whom Bonaventura had sent to

7   represent him, assured the Board that Bonaventura had no intention of moving forward with the

8   show. (*Id.* ¶ 13).

9      In early 2012, Lt. Hadi Sadjadi (presumably also of the LVTCO, though not explicitly so

10  alleged) questioned Plaintiff and her boyfriend, Deputy Ray Jacoby, about an incident involving

11  Jacoby that had resulted in a citizens complaint against him. (*See id.* ¶¶ 14–15).  Plaintiff did not

12  receive forty-eight hours notice of the interview, and during the interview, Sadjadi did not inform

13  Plaintiff of her rights under the "Peace Officer's Bill of Rights in Chapter 289 of the Nevada

14  Revised Statutes ("NRS") or of her right to representation. (*Id.* ¶ 14).  When Plaintiff complained

15  of the alleged violations of Chapter 289, Lt. Sadjadi told her to speak to Bonaventura. (*See id.*

16  ¶ 17).  Deputy Chief Dean Lauer ultimately gave Plaintiff a verbal warning as a result of the

17  incident. (*Id.* ¶ 16).  When Plaintiff spoke with Bonaventura about the alleged Chapter 289

18  violations at her interview with Lt. Sadjadi, Bonaventura told her LTVCO "would not love her

19  again" until she "dumped Ray [Jacoby]." (*Id.* ¶ 18).  She was also told not to worry, because

20  LTVCO needed its "female, its Jew, and its black." (*Id.* ¶ 18).[1]

21     In early July 2012, Toomin directed Plaintiff to write a biography for the reality show,

22  because the producers wanted to feature her in the show. (*Id.* ¶ 19).  Plaintiff expressed her

23  concerns because LVTCO had assured the Board that there would be no show after the Board

24

25       [1]Plaintiff does not directly allege here, or elsewhere in the Complaint, whether she is
    African-American and/or Jewish.

1    expressed its concerns, and Toomin told her it was a secret and that she should not tell anyone.

2    (*Id.*).  Plaintiff contacted County Commissioner Steve Sisolak to express her concerns but also

3    wrote the biography as instructed, telling her superiors she was only complying out of fear of

4    reprisal for non-compliance. (*Id.*).  Plaintiff then advised Bonaventura and Toomin that she

5    would not participate in the realty show. (*Id.* ¶ 20).  On July 13, 2012, Bonaventura terminated

6    Plaintiff. (*Id.*).

7         Plaintiff exhausted her administrative remedies with the Equal Employment Opportunity

8    Commission ("EEOC") and received a Right-to-Sue Letter ("RTS") on August 30, 2013. (*Id.*

9    ¶¶ 22–24).[2]  Plaintiff sued Bonaventura, Toomin, LVTCO (collectively "LTVCO Defendants"),

10   and Clark County in this Court less than ninety days later on October 21, 2013.  The Complaint

11   lists seven nominal causes of action: (1) Hostile Workplace Environment ("HWE") under Title

12   VII; (2) Sexual Harrassment (Quid Pro Quo) under Title VII; (3) Retaliation under Title VII; (4)

13   Breach of Contract; (5) Violations of Chapter 289 and the Due Process Clauses of the U.S. and

14   Nevada Constitutions; (6) Breach of the Implied Covenant of Good Faith and Fair Dealing (in

15   both contract and tort); and (7) Wrongful Discharge.  Clark County moved to dismiss, and

16   LTVCO Defendants moved to dismiss or, in the alternative, for summary judgment.  The Court

17   granted the County's motion when Plaintiff failed to timely oppose it.  The Court dismissed the

18   fourth, fifth, and sixth causes of action as against LTVCO Defendants for improper claim-

19   splitting based on a pending state court case.  The Court dismissed the seventh cause of action as

20   against LTVCO Defendants based on Nevada's employment-at-will doctrine.  LTVCO

21   Defendants have now filed a successive motion to dismiss or for summary judgment as against

22   the remaining three causes of action under Title VII.

23   ///

24   ───────────────

25        [2]Plaintiff does not allege the nature of the charge of discrimination to the EEOC, but
     presumably it was for sex discrimination.

1   **II.    LEGAL STANDARDS**

2        **A.    Dismissal**

3        Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the

4   claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of

5   what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47

6   (1957).  Federal Rule of Civil Procedure 12(b)(6) mandates that a court dismiss a cause of action

7   that fails to state a claim upon which relief can be granted.  A motion to dismiss under Rule

8   12(b)(6) tests the complaint's sufficiency. *See N. Star Int'l v. Ariz. Corp. Comm'n*, 720

9   F.2d 578, 581 (9th Cir. 1983).  When considering a motion to dismiss under Rule 12(b)(6) for

10  failure to state a claim, dismissal is appropriate only when the complaint does not give the

11  defendant fair notice of a legally cognizable claim and the grounds on which it rests. *See Bell*

12  *Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  In considering whether the complaint is

13  sufficient to state a claim, the court will take all material allegations as true and construe them in

14  the light most favorable to the plaintiff. *See NL Indus., Inc. v. Kaplan*, 792 F.2d 896, 898 (9th

15  Cir. 1986).  The court, however, is not required to accept as true allegations that are merely

16  conclusory, unwarranted deductions of fact, or unreasonable inferences. *See Sprewell v. Golden*

17  *State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).  A formulaic recitation of a cause of action

18  with conclusory allegations is not sufficient; a plaintiff must plead facts pertaining to his own

19  case making a violation plausible, not just possible. *Ashcroft v. Iqbal*, 556 U.S. 662, 677–79

20  (2009) (citing *Twombly*, 550 U.S. at 556) ("A claim has facial plausibility when the plaintiff

21  pleads factual content that allows the court to draw the reasonable inference that the defendant is

22  liable for the misconduct alleged.").  In other words, under the modern interpretation of Rule

23  8(a), a plaintiff must not only specify or imply a cognizable legal theory (*Conley* review), but

24  also must plead the facts of his own case so that the court can determine whether the plaintiff has

25

1  any plausible basis for relief under the legal theory he has specified or implied, assuming the

2  facts are as he alleges (*Twombly-Iqbal* review).

3        "Generally, a district court may not consider any material beyond the pleadings in ruling

4  on a Rule 12(b)(6) motion.  However, material which is properly submitted as part of the

5  complaint may be considered on a motion to dismiss." *Hal Roach Studios, Inc. v. Richard Feiner*

6  *& Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990) (citation omitted).  Similarly, "documents

7  whose contents are alleged in a complaint and whose authenticity no party questions, but which

8  are not physically attached to the pleading, may be considered in ruling on a Rule 12(b)(6)

9  motion to dismiss" without converting the motion to dismiss into a motion for summary

10 judgment. *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994).  Moreover, under Federal Rule

11 of Evidence 201, a court may take judicial notice of "matters of public record." *Mack v. S. Bay*

12 *Beer Distribs., Inc.*, 798 F.2d 1279, 1282 (9th Cir. 1986).  Otherwise, if the district court

13 considers materials outside of the pleadings, the motion to dismiss is converted into a motion for

14 summary judgment. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir.

15 2001).

16        **B.    Summary Judgment**

17        A court must grant summary judgment when "the movant shows that there is no genuine

18 dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

19 Civ. P. 56(a).  Material facts are those which may affect the outcome of the case. *See Anderson v.*

20 *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there

21 is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See id.*  A

22 principal purpose of summary judgment is "to isolate and dispose of factually unsupported

23 claims." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  In determining summary

24 judgment, a court uses a burden-shifting scheme:

25

1

2

3

> When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.  In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case.

4   *C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (citations

5   and internal quotation marks omitted).  In contrast, when the nonmoving party bears the burden

6   of proving the claim or defense, the moving party can meet its burden in two ways: (1) by

7   presenting evidence to negate an essential element of the nonmoving party's case; or (2) by

8   demonstrating that the nonmoving party failed to make a showing sufficient to establish an

9   element essential to that party's case on which that party will bear the burden of proof at trial. *See*

10  *Celotex Corp.*, 477 U.S. at 323–24.  If the moving party fails to meet its initial burden, summary

11  judgment must be denied and the court need not consider the nonmoving party's evidence. *See*

12  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60 (1970).

13       If the moving party meets its initial burden, the burden then shifts to the opposing party to

14  establish a genuine issue of material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

15  475 U.S. 574, 586 (1986).  To establish the existence of a factual dispute, the opposing party

16  need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

17  claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

18  versions of the truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

19  626, 631 (9th Cir. 1987).  In other words, the nonmoving party cannot avoid summary judgment

20  by relying solely on conclusory allegations unsupported by facts. *See Taylor v. List*, 880 F.2d

21  1040, 1045 (9th Cir. 1989).  Instead, the opposition must go beyond the assertions and

22  allegations of the pleadings and set forth specific facts by producing competent evidence that

23  shows a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *Celotex Corp.*, 477 U.S. at 324.

24       At the summary judgment stage, a court's function is not to weigh the evidence and

25  determine the truth, but to determine whether there is a genuine issue for trial. *See Anderson*, 477

1   U.S. at 249.  The evidence of the nonmovant is "to be believed, and all justifiable inferences are

2   to be drawn in his favor." *Id*. at 255.  But if the evidence of the nonmoving party is merely

3   colorable or is not significantly probative, summary judgment may be granted. *See id.* at 249–50.

4   **III.    ANALYSIS**

5           Defendants argue that they are entitled to discretionary immunity against the Title VII

6   claims under state law.  In Nevada, certain governmental actors have discretionary immunity

7   under certain circumstances, Nev. Rev. Stat. § 41.032, even where the State of Nevada has

8   otherwise waived its common law sovereign immunity, *see id.* § 41.031.  But Congress validly

9   stripped the States of their common law sovereign immunity as to Title VII claims (and created

10  jurisdiction for such suits in federal court pursuant to § 5 of the Fourteenth Amendment,

11  notwithstanding the Eleventh Amendment bar to federal jurisdiction over such claims that

12  otherwise applies) via the Civil Rights Act of 1964. *See generally Fitzpatrick v. Bitzer*, 427 U.S.

13  445 (1976) (Rehnquist, J.).  Defendants therefore have no discretionary immunity, which is

14  simply a limited reservation of the common law sovereign immunity that Congress has stripped

15  with respect to Title VII.

16          Defendants also argue that the Court should abstain under the *Colorado River* doctrine.

17  *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976) involved

18  parallel state and federal proceedings concerning water rights in Colorado.  The United States

19  filed suit in federal court to secure its rights to certain water as against approximately 1000

20  individual users.  One of the defendants in the federal action then filed a parallel suit in state

21  court, and several other defendants filed a motion to dismiss the federal action for lack of

22  jurisdiction.  The district court granted the motion.  The Supreme Court found that jurisdiction

23  was not lacking and abstention was inappropriate but nevertheless ruled that dismissal was

24  appropriate based on the need to avoid duplicative litigation and "(w)ise judicial administration,

25  giving regard to conservation of judicial resources and comprehensive disposition of litigation."

1    *Id.* at 817.  The case was anomalous because it permitted a federal court to dismiss a case over

2    which it in fact had jurisdiction and where abstention was not appropriate. *See id.* at 821–26

3    (Stewart, J., dissenting).  Even the majority noted that "[t]he doctrine of abstention, under which

4    a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an

5    extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy

6    properly before it." *Id.* at 813 (majority opinion) (citation and internal quotation marks omitted).

7    Moreover, *Colorado River* is tightly fact-bound to the water-rights context. *See Arizona v. San*

8    *Carlos Apache Tribe of Ariz.*, 463 U.S. 545, 571 (1983) (noting that "water rights adjudication is

9    a virtually unique type of proceeding"); *id.* at 572 (Marshall, J., dissenting) (noting that the

10   *Colorado River* doctrine "govern[s] controversies involving federal water rights").  Even

11   assuming the Court intended a broader application, the *Colorado River* doctrine is simply not an

12   abstention doctrine based on considerations of federal–state comity, as is often argued by

13   litigants attempting to avoid federal court, but rather is a *sui generis* doctrine designed to

14   maximize the overall efficiency of co-pending litigation. *Moses H. Cone Mem'l Hosp. v.*

15   *Mercury Constr. Corp.*, 460 U.S. 1, 14–15 (1983) ("[In *Colorado River*], we held that the

16   District Court's dismissal was proper on another ground—one resting not on considerations of

17   state–federal comity or on avoidance of constitutional decisions, as does abstention, but on

18   'considerations of "[w]ise judicial administration, giving regard to conservation of judicial

19   resources and comprehensive disposition of litigation."'" (second alteration in original)).  The

20   factors to consider when deciding to dismiss under *Colorado River* include the inconvenience of

21   the federal forum, the desirability of avoiding piecemeal litigation, and the order in which the

22   competing fora obtained jurisdiction. *Id.* at 15 (citing *Colorado River*, 424 U.S. at 818–19).  The

23   decision is "highly weighted in favor of the exercise of jurisdiction." *Id.* at 16.

24          Here, there is no indication of competing jurisdiction over a res or a complex system of

25   property rights, and the Court has already dismissed the improperly split claims.  There is nothing

inappropriate about a litigant maintaining a suit in federal court on federal causes of action while maintaining another suit in state court on state causes of action simply because the claims arise out of the same event or series of events. Indeed, where such a litigant brings all claims in federal court, the district court has explicit statutory discretion to decline jurisdiction over the state law claims if those claims predominate. *See* 28 U.S.C. § 1367(c)(2). But there are simply no state law claims remaining to dismiss in this case, and the Court will not dismiss federal claims under *Colorado River*.

Defendants also argue that Plaintiff was an at-will employee. The Court has already determined that issue in favor of Defendants and dismissed the seventh cause of action, accordingly. The issue is still relevant to the remaining Title VII claims, however, and the Court addresses why, *infra*.

Defendants also argue that Plaintiff failed to exhaust her administrative remedies under state law. But the only administrative remedies a Title VII plaintiff must exhaust are those under Title VII, and Defendants do not argue any failure to exhaust those remedies. They only argue that Plaintiff failed to exhaust her state law remedies under Chapter 289 of the Nevada Revised Statutes, which governs general employment grievances by peace officers under the civil service laws. That issue is irrelevant to the Title VII claims. Section 2000e-5(c) requires a Title VII plaintiff to first exhaust administrative remedies with any state law agency providing a remedy for violation of Title VII-type standards, but the Nevada Equal Rights Commission ("NERC") has a work-sharing agreement with the EEOC such that filing a complaint with either agency constitutes a constructive filing with the other, *EEOC v. Dinuba Med. Clinic*, 222 F.3d 580, 585 (9th Cir. 2000), and the effect of the agreement is therefore to obviate the requirement to separately file with the state agency under section 2000e-5(c). A plaintiff necessarily gives NERC an opportunity to review a charge in the first instance by filing with the EEOC, because charges filed with the EEOC are forwarded to (and therefore constructively filed with) the NERC

via the work-sharing agreement, and the EEOC defers consideration for sixty days while NERC reviews the charge. *See id.*  Even if the EEOC failed to forward the charge to NERC as required under the agreement as a factual matter, Plaintiff could not be faulted for the failure.  In light of the work-sharing agreement between EEOC and NERC, she did everything expected of her to give the NERC a chance to review the charge when she filed a charge with the EEOC. *See Laquaglia v. Rio Hotel & Casino, Inc.*, 186 F.3d 1172, 1176 (9th Cir. 1999) ("In determining whether Laquaglia's claim was 'dual-filed,' it does not matter whether or not her January 19th charge actually was forwarded to the EEOC—only whether it was intended to be forwarded under the worksharing agreement.  For purposes of the constructive filing of a charge with the EEOC, it is irrelevant whether the state agency actually followed the referral provisions in the agreement or erroneously began investigating a complaint that should have been forwarded to the EEOC.  Waiver provisions in workshare agreements should not be 'contingent upon scrupulous compliance' with the referral provisions; otherwise, claimants with potentially meritorious claims might be denied relief as a result of bureaucratic mix-ups.  With that in mind, we read the worksharing agreement at issue to grant dual-filed status to all Title VII charges within the 'mutual jurisdiction' of both the NERC and the EEOC." (citations omitted)).

Finally, Defendants argue that Plaintiff was not an "employee" under Title VII because she was part of the personal staff of an elected official:

> The term "employee" means an individual employed by an employer, except that *the term "employee" shall not include any person elected to public office in any State or political subdivision of any State by the qualified voters thereof, or any person chosen by such officer to be on such officer's personal staff*, or an appointee on the policy making level or an immediate adviser with respect to the exercise of the constitutional or legal powers of the office.  The exemption set forth in the preceding sentence shall not include employees subject to the civil service laws of a State government, governmental agency or political subdivision.  With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States.

42 U.S.C. § 2000e(f) (emphasis added).  It appears undisputed that Bonaventura himself was not

an "employee" under this definition.  Plaintiff affirmatively alleges Bonaventura's public election

to his position.  The question is whether Plaintiff was a "person chosen by [Bonaventura] to be

on [his] personal staff."  This question is not irrelevant to the Title VII claims, as Plaintiff argues.

If Plaintiff falls within this definition, she is simply not an "employee" who may sue under Title

VII.  In the context of deputy law enforcement officers, the Courts of Appeals distinguish

between employees and non-employees for the purposes of Title VII based on the level of

discretion the elected official has over the alleged employee's continued employment and the

amount of direct contact the alleged employee has with the official on a day-to-day basis.  Where

a deputy does not report directly to the elected official or where the deputy does report directly to

the elected official, but only because the force is very small and otherwise functions as a typical

police officer as opposed to a specialized assistant, the deputy is not excluded as an "employee"

under subsection (f). *See, e.g.*, *Cromer v. Brown*, 88 F.3d 1315, 1323–24 (4th Cir. 1996).  On the

other hand, where a deputy serves at the pleasure of the elected official who may remove him at

will (as opposed to those subject to state or local civil service laws) and where the elected official

is the only public official to whom the deputy reports, the deputy is part of the elected official's

"personal staff" excluded as an "employee" under subsection (f). *See, e.g.*, *Owens v. Rush*, 654

F.2d 1370, 1375–76 (10th Cir. 1981) (citing *Ramirez v. San Mateo Cnty.*, 639 F.2d 509, 513 (9th

Cir. 1981)).

       In *Ramirez*, the district court had dismissed the plaintiff's Title VII claim for refusal to

hire him as a deputy district attorney based upon his national origin. *See* 639 F.2d at 510.  The

Court of Appeals affirmed, finding that the deputy district attorney position at issue was directly

on point with the assistant district attorney position at issue in *Wall v. Coleman*, 393 F. Supp. 826

(S.D. Ga. 1975). *See id.* at 512–13.  The Court of Appeals noted that in *Wall*, the district court

had noted that the assistant district attorneys "do what he delegates to them, serve at his pleasure

and work as his assistants instead of working as assistants for all district attorneys of this state . . . ." *Id.* at 513 (quoting *Wall*, 393 F. Supp. at 831).  The court continued:

> A similar distinctiveness characterizes the position of deputy district attorney in San Mateo County.  Unlike most other county workers, deputy district attorneys serve at the pleasure of their superior, the district attorney, who has plenary power of appointment and removal.  Also unlike others employed by the county, deputies are not subject to the normal protections of the county civil service system.
>
> This characterization of the deputy's position in county law tells us much about the working relationship the county envisions between district attorney and deputy.  The exclusive powers of selection and retention indicate that deputies perform to the district attorney's personal satisfaction rather than to the more generalized standards applied to other county workers by the civil service system.  Such a level of personal accountability is consistent with the highly sensitive and confidential nature of the work which deputies perform as well as with the considerable powers of the deputy to represent the district attorney in legal proceedings and in the eyes of the public.  We conclude that when a job includes this level of personal accountability to one elected official, it is precisely the sort of job Congress envisioned to be within the "personal staff" of that official and thus exempt from Title VII.

*Id.* at 513 (citation omitted).

Here, Defendants argue, and Plaintiff does not appear to dispute, that Plaintiff was terminable at will by Bonaventura.  Exhibit 1 to the previous motion contains, *inter alia*, Plaintiff's Revocation, Appointment, and Employee Agreement. (*See* ECF No. 24-2).  The Appointment indicates that Bonaventura appointed Plaintiff and that she would hold her office until "December 31, 2012, or upon revocation by the Constable at an earlier time." (Appointment, Jan. 3, 2012, ECF No. 24-2, at 2).  The Agreement also indicated at-will employment. (*See* Agreement, Jan. 19, 2012, ECF No. 24-2, at 3).  Bonaventura revoked Plaintiff's appointment on July 13, 2012. (*See* Revocation, July 13, 2012, ECF No. 24-2, at 1).  Contrary to Plaintiff's argument in response, the fact that Plaintiff was terminable at will by Bonaventura is therefore relevant to whether a Title VII claim can lie, because if she was terminable at will, she was less likely to be an "employee" under Title VII where her supervisor was a publicly elected official.  This argument is therefore not merely a rehash of the at-will

1    employment issue resolved in the previous order as to the state law claims, but is directly

2    relevant to the Title VII claims.  Although the legal standards that govern a Title VII claim are

3    pure matters of federal law, certain conclusions of state law constitute *facts* relevant to

4    application of the federal standards.  Most importantly, whether a plaintiff enjoyed state civil

5    service law protection requires a conclusion of state law, but the answer to that question

6    constitutes a fact that is clearly relevant to determining the mixed question of law and fact

7    whether a plaintiff is an "employee" under Title VII.  A case Plaintiff herself quotes in relevant

8    part recognizes the distinction between an inappropriate argument that state law can govern Title

9    VII's standards directly and an appropriate argument that state law can provide facts relevant to

10   applying Title VII's standards. *See Calderon v. Martin Cnty.*, 639 F.2d 271, 272–73 (11th Cir.

11   1981) ("State law is relevant insofar as it describes the plaintiff's position, including his duties

12   and the way he is hired, supervised and fired.  A state court determination that a particular type of

13   worker is not an 'employee' for purposes of state statutes, however, does not in itself resolve the

14   issue of whether that worker is an employee for purposes of Title VII.").  Because is it

15   undisputed that Plaintiff was terminable at will by Bonaventura, if Defendants have also shown

16   that it is undisputed that Plaintiff was not protected by any civil service laws, the Court should

17   grant summary judgment to Defendants under *Ramirez* unless Plaintiff has produced evidence

18   showing a genuine issue of material fact as to the nature of the relationship.

19        Plaintiff points out that deputy constables must be "certified by the Peace Officers'

20   Standards and Training Commission as a category I or category II peace officer" before being

21   appointed and that they may not make policy decisions. *See* Nev. Rev. Stat. § 258.060.  But this

22   does not indicate civil service protection or that the appointing authority does not have plenary

23   hiring and firing power.  The requirement of a professional certification by a state professional

24   body has nothing whatsoever to do with the employment relationship between an elected official

25

and his appointees.  Presumably, the deputy district attorneys in *Ramirez* were required to be

certified to practice law by the California State Bar.

Next, a lack of policy-making authority does not indicate that the appointee is not a

member of the elected official's "personal staff" under the statute.  Personal staff may or may not

have policy-making authority.  Policy-making authority is not a factor relevant to whether an

appointee is on an elected official's "personal staff," but rather is an additional, disjunctive way

to show that an appointee is not an "employee" under Title VII:

> [T]he term "employee" shall not include any person elected to public office in any
> State or political subdivision of any State by the qualified voters thereof, or any
> person chosen by such officer to be on such officer's personal staff, *or* an appointee
> on the policy making level or an immediate adviser with respect to the exercise of the
> constitutional or legal powers of the office.

42 U.S.C. 2000e(f) (emphasis added).  Defendants have not argued that Plaintiff had policy

making authority, nor need they.

Plaintiff also points out that deputy constables are "peace officers" by statute. *See id.*

§ 258.070(1)(a).  But this designation alone merely indicates an appointee's powers under state

law, not the nature of an appointee's legal relationship with her supervisor.  To say that deputy

constables are peace officers and therefore cannot be "mere" personal staff is a non-sequitur.

The deputy district attorneys in *Ramirez* presumably had the power to represent the state in court

just as the district attorney himself did.

Next, the distinction between deputy constables in large townships and small townships

has nothing to do with the employment relationship, but only with limitations on the deputy

constables' power in small townships absent additional certifications. *Compare id.*, *with id.*

§ 258.070(2).  In fact, the additional limitations in small townships also apply to elected

constables *themselves*, not only to their deputies. *See id.* § 258.070(2).  The distinction has

nothing to do with employment relationships between elected constables and deputy constables.

1    Plaintiff also argues that the statutes permit constables to hire "clerical and operational

2    staff" as the constable's work requires. *See id.* § 258.065(1). Such staff are not peace officers.

3    *See id.* § 258.065(2)(a). But this statute simply indicates that constables may appoint two classes

4    of workers: deputies and non-deputy clerical workers. It does not assist in determining whether

5    either class of workers are "personal staff" under the meaning of Title VII.

6    Plaintiff's best argument is that there were sergeants, lieutenants, and other personnel in

7    LVTCO chain of command between her and Bonaventura, which is consistent with the

8    allegations in the Complaint concerning a "Deputy Chief" and a "Lieutenant." This fact could

9    support a finding that Plaintiff was an "employee" under Title VII. *See Cromer*, 88 F.3d at

10   1323–24. This was not the case in *Ramirez* or *Wall*, where the deputy and assistant district

11   attorneys reported directly to the respective district attorneys. Defendants have not provided any

12   evidence showing that Plaintiff reported directly to Bonaventura with no intermediary. The

13   Court therefore finds that there is a genuine issue of material fact as to the command structure

14   that is relevant to the determination of the "employee" issue under § 2000e(f).[3]

15   In reply, Defendants additionally argue that all constables and their deputies are "public

16   officers and electors" in Nevada. *See* Nev. Const. art. XV, § 3. The citation is to a section of the

17

18   _____

     [3]Because the exemptions in § 2000e(f) are to be construed narrowly, *see, e.g.*, *Gunaca v.*
19   *State of Tex.*, 65 F.3d 467, 471 (5th Cir. 1995), it appears unlikely that one could ever be held to
     be a member of an elected official's "personal staff" where the person does not even report
20   directly to the elected official, but only to an intermediary in a para-military chain of command.
     The Supreme Court has adopted a similar approach with respect to the presidential appointment
21   power. *Cf. Edmond v. United States*, 520 U.S. 651, 662–63 (1997) ("Generally speaking, the
     term 'inferior officer' connotes a relationship with some higher ranking officer or officers below
22   the President: Whether one is an 'inferior' officer depends on whether he has a superior. It is
     not enough that other officers may be identified who formally maintain a higher rank, or possess
23   responsibilities of a greater magnitude. If that were the intention, the Constitution might have
     used the phrase 'lesser officer.' Rather, in the context of a Clause designed to preserve political
24   accountability relative to important Government assignments, we think it evident that 'inferior
     officers' are officers whose work is directed and supervised at some level by others who were
25   appointed by Presidential nomination with the advice and consent of the Senate.").

1    Nevada Constitution imposing term limits and limiting eligibility to run for public office to those

2    who are eligible to vote.  Section 2000e(f) exempts those "elected to public office."  It appears as

3    if Defendants attempt to fit into this definition any person who is a public official and a qualified

4    elector, i.e., a person qualified to vote.  The Court rejects this word-jumble-style interpretation of

5    section 2000e(f).  Defendants also repeat arguments made in the motion, but they do not

6    satisfactorily address the command structure issue, which the Court finds creates a genuine issue

7    of material fact as to whether Plaintiff is an "employee" under Title VII.  Plaintiff's deposition

8    does not indicate explicitly to whom she reported directly, but in several places she indicates

9    having reported to persons in the chain of command other than Bonaventura himself.

10        Next, Defendants argue that the retaliation claim must fail.  Defendants reason that

11   because Plaintiff was not an "employee," Title VII does not apply, and her complaints about

12   sexual harassment were therefore not protected activity under the statute.  This argument falls

13   with the argument under 2000e(f).

14        Next, Defendants argue that Plaintiff should be judicially estopped from bringing her

15   claims because she failed to disclose the litigation in her bankruptcy schedules.  In *Hamilton v.*

16   *State Farm Fire & Casualty Co.*, 270 F.3d 778 (9th Cir. 2001) (Brunetti, J.), the Court of

17   Appeals ruled that a plaintiff was judicially estopped from bringing claims against his insurance

18   company where he had failed to list those claims as assets of the bankruptcy estate in his

19   bankruptcy proceedings.  "In the bankruptcy context, a party is judicially estopped from asserting

20   a cause of action not raised in a reorganization plan or otherwise mentioned in the debtor's

21   schedules or disclosure statements." *Id.* at 783.  "Hamilton is precluded from pursuing claims

22   about which he had knowledge, but did not disclose, during his bankruptcy proceedings, and that

23   a discharge of debt by a bankruptcy court, under these circumstances, is sufficient acceptance to

24   provide a basis for judicial estoppel, even if the discharge is later vacated." *Id.* at 784.  In other

25   words, a plaintiff may not in equity conceal a contingent claim from his creditors and obtain a

Page 16 of  17

more favorable discharge in bankruptcy than he would have obtained had he disclosed the contingent claim and then bring the previously concealed claim later as a civil case. *Hamilton* is on all fours with the present case. Defendants adduce Plaintiff's bankruptcy schedules. Plaintiff petitioned for Chapter 7 bankruptcy in this District on August 3, 2012 (Case No. 12-bk-19119-LBR). She received a discharge on November 7, 2012. Item 21 of Schedule B of the Petition for "Other contingent and unliquidated claims of every nature . . . ." lists nothing. Plaintiff filed a charge of discrimination with the EEOC on August 27, 2012, three weeks after she petitioned for bankruptcy and two months before she received a discharge. Plaintiff does not appear to have ever disclosed to the bankruptcy court the existence of her contingent claims, i.e., the present Title VII claims. The Court therefore finds that Plaintiff is judicially estopped from bringing the present Title VII claims. Additionally, the Court agrees with Defendants that under the circumstances of this case Toomin is not an "employer" who can be sued under Title VII at all and that Bonaventura can only be sued in his official capacity.

## CONCLUSION

IT IS HEREBY ORDERED that the Motion to Dismiss or for Summary Judgment (ECF No. 67) is GRANTED as a motion for summary judgment.

IT IS FURTHER ORDERED that the Clerk shall enter judgment and close the case.

IT IS SO ORDERED.

Dated this 17th day of April, 2014.

_____
ROBERT C. JONES
United States District Judge